UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

SHELBY HANSHAW Individually and as the
Next Friend and Mother of T. H., a minor,

    Plaintiffs,

v.                      CIVIL ACTION NO. 3:22-cv-00127

CABELL HUNTINGTON HOSPITAL, INC.,
MARSHALL UNIVERSITY BOARD OF
GOVERNORS and JOHN DOES "1" Through "5",

    Defendants.

## COMPLAINT

Come now the Plaintiffs, Shelby Hanshaw, Individually and as the Next Friend and Mother of T. H., a minor, by counsel, and hereby file this Complaint against Defendants, Cabell Huntington Hospital, Inc., Marshall University Board of Governors and John Does "1" through "5", showing the Court, as follows:

### PARTIES, JURISDICTION AND VENUE

1. Jurisdiction is founded on diversity of citizenship and amount:

    (a) Plaintiff, Shelby Hanshaw, at all times relevant is the mother of T. H., a minor. Shelby Hanshaw and T. H. are residents of Kentucky.

    (b) T. H., a minor and/or child under the age of eighteen, was born at Cabell Huntington Hospital in Cabell County, West Virginia.

    (c) Defendant, Cabell Huntington Hospital, Inc. (hereinafter referred to as "CHH"), is a West Virginia corporation with its principal place of business located in Huntington, Cabell County, West Virginia. All acts

and omissions of CHH as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employment and/or ownership.

(d) At all times relevant herein, CHH operated, employed and engaged medical facilities, physicians, physicians' assistants, nurses and other personnel as agents, servants and/or employees to provide medical and health care services to the public, and at all times relevant herein, said facilities, agents, servants and/or employees were acting within the course and scope of their employment and or agency with said Defendant and in furtherance of said Defendant's businesses, thereby rendering said Defendant vicariously liable for the negligent acts and/or omissions of said owners, agents, servants, employees and or facilities under the doctrines of respondeat superior and/or apparent or ostensible agency.

(e) Defendant, Marshall University Board of Governors (hereinafter called "MUBOG"), is located and has its principal place of business in Huntington, Cabell County, West Virginia.  MUBOG conducts, supervises and controls the business, employment, educational and medical affairs of Marshall University including, but not limited to, the Joan C. Edwards School of Medicine and University Physicians and Surgeons, Inc. doing business as Marshall Health.  All acts done herein were done by Defendant, its agents, servants, employees, businesses, health care facilities and/or owners including, but not limited to, the Joan C. Edwards School of Medicine and University Physicians and Surgeons, Inc. doing

business as Marshall Health, acting in the course and scope of their respective agencies, services, employment, businesses and/or ownership.

(f) At all times relevant herein, MUBOG, operated, employed and engaged medical facilities, physicians, physicians' assistants, nurses and other personnel as agents, servants and/or employees to provide medical and health care services to the public, and at all times relevant herein, said facilities, agents, servants and/or employees were acting within the course and scope of their employment and or agency with said Defendants and in furtherance of said Defendant's businesses, thereby rendering said Defendant vicariously liable for the negligent acts and/or omissions of said owners, agents, servants, employees and or facilities under the doctrines of respondeat superior and/or apparent or ostensible agency.

(g) Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as John Does "1" through "5", inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs' will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and based thereon allege that each of the fictitiously named Defendant(s) is/are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' injuries as herein alleged were legally caused by said negligence and/or negligent medical care. Plaintiffs are informed and believe and thereupon allege that at all material times, John Does and each of them, were acting in their own capacities or were the agents actual or ostensible of CHH or John Doe

>Defendants, employees and/or joint venturers of one or more Defendants, and were acting within the course and scope of such agency, employment and/or joint venture.  Defendant(s) John Doe(s), name(s) and address(es) unknown, were physician(s) nurse(s), medical provider(s), technician(s), business(es), corporation(s) or other entity(ies) that provided negligent medical care, individually or by and through their employees and/or agents, actual or ostensible.  Plaintiffs have been unable to identify the name(s) of Defendant(s) John Doe(s) through exercise of due diligence.  Based upon information and belief, John Does "1" through "5" are residents of West Virginia.

2. The matters in controversy exceed, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

3. The matters in controversy arose out of acts or omissions that occurred in Cabell County, West Virginia.

4. Jurisdiction and venue are proper in the United States District Court for the Southern District of West Virginia at Huntington.

## FACTUAL BACKGROUND

5. Plaintiffs reassert paragraphs numbered 1-4 of this Complaint as if fully stated verbatim herein.

6. In 2017, Shelby Hanshaw, received prenatal medical treatment and care from the MUBOG's agents, servants or employees.  The course of the pregnancy was unremarkable.

7. At Shelby's last prenatal visit on September 2, 2017, she was not having any prenatal problems.

8.      Dr. Pauley admitted Shelby to Cabell Huntington Hospital at 22:35 on September 12, 2017 for induction of labor.

9.      The medical record reflects that at 23:19 on September 12, 2017, Dr. Sinning placed a Cervidil vaginal insert (dinoprostone 10 mg, a $PGE_2$ prostaglandin) for cervical ripening. Fetal status was reassuring at 23:30.

10.      The last entry in the CCH OB Flowsheets, timed at 03:30 on 09/13/2017, noted the contractions were "mild," 5-7 minutes apart and lasting 30-70 seconds. Fetal heart rate (FHR) was 135 bpm with moderate variability of the baseline, accelerations present and decelerations absent.

11.      The first Ob Progress Note was written by Benjamin Schnakenberg, M.D. at 09:35 on September 12, 2017. He stated the patient was doing well and that he planned to recheck the cervix after the Cervidil was removed. Although the removal time of the Cervidil was not documented in the chart, it is traditionally removed after 12 hours if active labor has not begun. According to the Operative Report dictated by Kevin White, M.D., on September 14, 2017, "Cervidil was then removed and she remained unchanged."

12.      Audrey Justine Hicks, D.O. wrote the next Ob Progress Note at 11:42, in which she documented a cervical examination (1-2/50/-2) by the RN, contractions 3-5 minutes apart, and a Category I FHR strip (reassuring). Oxytocin was started in a low-dose protocol with 2mu/min at 12:10. The order read to titrate the dose, increasing the oxytocin by 2 mu/min every 20 minutes until an adequate labor pattern was achieved (≥200 MVUs).

13.      Kevin White, M.D. made the next Ob Progress Note at 14:14, having ruptured the membranes at 14:07. According to the hand-written Delivery Room Record signed by Dr. Lisa G. Burke, M.D., the amniotic fluid was clear at the time of Artificial Rupture Of Membranes

(AROM). Dr. White described a cervical exam (2/70/-2), contractions 3-5 minutes apart, and a Category I FHR pattern.

14. A combined spinal/epidural block was placed at about 15:00 for labor analgesia. The next Ob Progress Note was made by Jerrod Justice, M.D., at 16:10, who placed an Intra-Uterine Pressure Catheter (IUPC). On exam, the cervix was 1-2/50/-2, contractions were 2 minutes apart on 10 mu/min of oxytocin, and the fetal status was Category I.

15. Emelia Winston, D.O. examined Shelby at 23:07, noting a cervical exam (3-4/70/-1) and contractions 2-3 minutes apart on 26 mu/min of oxytocin. Dr. Winston was the first provider to describe the quality of the labor: 210 MVUs. However, she made no reference to the fetal response to labor, leaving description of the FHT pattern and Category nomenclature blank. Dr. Sinning was the next physician to see Shelby. She recorded an exam at 01:05 on September 14, 2017: cervix (4/80/-1) "per RN," contractions every 2-3 minutes (>200 MVUs) on oxytocin 26 mu/min, and late decelerations of the FHR, "resolved with repositioning." Dr. Sinning's note included a statement that: "Dr. Roy aware."

16. Dr. Winston entered Obstetric Progress Notes at both 03:16 and 05:41, based on nursing examinations. At 03:16 the cervix was 5/80/-1, contractions were 2-3 minutes apart with oxytocin at 26 mu/min, and the tracing was labelled Category II. There was no description of the FHR, variability or episodic changes. Dr. Winston's note at 05:41 documented a cervical exam: 6/90/0. Contractions remained 2-3 minutes apart with 170 MVUs on 26 mu/min of oxytocin. Again, there was no comment on why the strip was Category II.

17. The last Obstetric Progress Note prior to delivery was that written by Dr. Hicks at 08:29 on 09/14/2017 which documented a recent nursing exam of the cervix: AL (Anterior Lip)/C (Complete)/+2. Dr. Hicks also noted decelerations of the FHR from a baseline of 150

bpm with pushing.  Contractions were 2-3 minutes apart on oxytocin 26 mu/min.  Dr. Hicks' plan was to recheck in 2 hours.

18.     According to the Maternal Vitals pages, Shelby's. axillary temperature at 09:26 on 09/14/2017 was 102.3°F and her pulse was 108 bpm at 10:00.  Previous temperature at 07:16 was 98.2°F.  Although there were no physician or nursing notes addressing the fever, the MAR (Medication Administration Record) documented the administration of intravenous ampicillin at 09:58, gentamycin at 10:35, clindamycin at 12:30, and cefazolin at 13:10, the latter ordered by Michael D. Sweeney, CRNA.  The ampicillin, gentamycin and clindamycin had been ordered at 09:31 by Kevin White, M.D. to be administered STAT.  Dr. White had also ordered intravenous acetaminophen 1,000 mg at 09:31.  However, the acetaminophen was not administered until 14:33, after the baby's delivery.  According to the MAR, Shelby had also been given acetaminophen 1,000 mg p.o. at 23:40 on 09/13/2017 for an unstated indication.

19.     In the Annotation Comments by Alexandra White, R.N. on the fetal monitoring strip at 09:51, the nurse documented that the patient had begun to push, and that Dr. Sexton was at the bedside.  With that first push, the FHR dropped to 70 bpm and Nurse White turned off the oxytocin.  Kevin White, M.D. was at the bedside at 10:07.  With persistence of late decelerations, Dr. White ordered that S. H. stop pushing at 10:10. Dr. Burke was at the bedside at 10:18, examines the patient's cervix: 10/100/1, and orders Nurse White to have the patient "labor down" at 10:20.  At 10:30, Nurse White documents in the Annotation Comments the persistence of late decelerations, fetal tachycardia (160 bpm), and that a physician has reviewed the strip.  There are no further documented physician visits or physician progress notes in the medical record until after the cesarean delivery.

20. According to the fetal monitoring strip, Shelby was transferred to the operating room at 13:01 on 09/14/2017 for what was termed in the Delivery Summary a non-elective, "ASAP" cesarean section. The Operative Report, prepared by Kevin White, M.D. and co-signed by the primary surgeon, Lisa G. Burke, M.D., listed the preoperative and postoperative diagnoses as: "Chorioamnionitis, preeclampsia non-severe, failure to progress and arrest of descent, pregnancy."

21. The Intraoperative Record reflects Shelby's arrival to the Operating Room at 13:06. Surgery under epidural anesthesia began at 13:20. After the surgeon "dislodged" the baby's head, Dr. Burke delivered the baby from the ROA position at 13:28 on September 14, 2017. Estimated blood loss (EBL) was 1,200 mL. Dr. White described as complications the bilateral uterine incision extensions, thick meconium, and a foul-smelling placenta.

22. Samples of cord blood apparently were not submitted for blood gas analysis. The placenta was sent to pathology for evaluation, but was not cultured. The placental pathology report by Krista L. Denning, M.D. confirmed a diagnosis of acute chorioamnionitis with funisitis. The placenta with green-tinged membranes weighed 584 gms and measured 20.7 x 16.7 x 3.2 cm. There was a 3-vessel cord, subchorionic fibrin and intraplacental fibrin/hemorrhage.

23. Shelby's post-operative course was unremarkable. She was continued on antibiotics for an additional 24 hours and remained afebrile and normotensive. Shelby was discharged on September 17, 2017 with medications limited to analgesics, prenatal vitamins, and iron.

24. At birth, T. H. weighed 7 lbs. and 14 oz. (3,570 gm) and had Apgar scores of 9, 5, and 9 at the 1, 5, and 10-minute intervals, respectively. With the onset of respiratory distress minutes after birth, a code pink was called. The NICU team arrived in the operating room at

13:30. Sara Morrison, RNC, part of that team, suctioned meconium stained amniotic fluid from the naso-pharynx but not below the cords as baby had already cried. Nurse Morrison also described the baby as cyanotic, with poor respiratory effort, and apneic at times. She provided positive-pressure ventilation via face mask and Neo-Tee resuscitator. T. H. was transported to the NICU with $FiO_2$ (fraction of inspired oxygen) set at 50% and an $O_2$ saturation of 92%.

25. According to the medical record, T. H. was admitted to the NICU at Cabell Huntington Hospital because of acute respiratory distress beginning shortly after his birth at 13:28 on 09/14/2017. Sara Morrison, RNC, performed an initial newborn examination of T. H. at 13:45 on 09/14/2017. Her findings included an abrasion on his crown, and a red mark on the left temporal region of his head. In addition to subcostal retractions and grunting, she described meconium in the mucus from his respiratory tract, as well as meconium staining of the umbilical cord. On neurological examination, Nurse Morrison described T. H. to be hypoactive and hypotonic.

26. Beverly Phillips, M.D. also prepared an admission NICU note in which she recounted that T. H. initially had depressed respiratory efforts with mild cyanosis. On Dr. Phillips' examination at 15:42, T. H. had a fever of 100.3°F, heart rate of 150 and respiratory rate of 68. Significant physical findings included elongation of his head, overriding sutures and bruising on his scalp. T. H. had shallow breaths, mild chest retractions and intermittent grunting. Neurologic exam (tone and activity) at that time was unremarkable.

27. Initial CBC at 14:37 included a WBC count was 18,200 with 33% segmented neutrophils and 9% stab forms. His CRP (C-Reactive Protein) on September 17, 2017 at 05:37 was elevated to 1.52 (normal: 0-0.3), consistent with an acute phase response to inflammation, also known as the systemic fetal inflammatory syndrome or fetal inflammatory response

syndrome, as well as neonatal sepsis due to as chorioamnionitis. Funisitis is another manifestation of the fetal inflammatory response syndrome and is associated with an adverse neonatal outcome. The chest X-ray was consistent with TTN (Transient Tachypnea of Newborn).

28. Dr. Phillip's assessment on admission to the NICU, as well as that of her attending, Joseph W. Werthammer, M.D., included acute respiratory distress, secondary to TTN, maternal chorioamnionitis, prolonged ROM (Rupture Of Membranes), and meconium-stained fluid. Initial treatment included ampicillin and gentamycin due to the history of prolonged ROM and maternal chorioamnionitis, pending blood culture results. Both aerobic and anerobic blood cultures had no growth after 5 days. CSF from the spinal tap performed 09/15 was negative for bacterial growth and the PCR for virus. The antibiotics were discontinued on 09/17. The CRP trended down and was normal at discharge. Newborn screening was normal, including the amino acid, fatty acid and organic acid profiles. He passed the hearing screen, bilaterally.

29. The bruising, redness, and abrasion on the baby's head, initially described on examinations by Nurse Morrison and Dr. Phillips, were subsequently identified as skin abnormalities in the Patient Care Parameter records, for which there were regular nursing entries during T. H's. hospital stay. Although Madea McGuire, R.N., did not describe a skin integrity impairment at 14:00 on September 16, 2017, Rita G. Yates, R.N., resumed reporting of an abnormality of skin integrity at 08:00 on September 18, 2017, depicting a small dry crusty area on the scalp near the crown.

30.     T. H. was discharged home on September 18, 2017 in satisfactory condition, having lost 150 grams since birth.  His classification on the newborn grid for weight, length and head circumference was AGA (Appropriate for Gestational Age).

31.     On August 26, 2019, Cheryl L. Cook, M.D., a pediatrician in Ashland, Kentucky, and his PCP, referred T. H. to Priya Durgadas Bolikal, M.D., a physical medicine and rehabilitation specialist at Cincinnati Children's Hospital in Cincinnati, Ohio for a cerebral palsy (CP) team visit.  According to the record, his family was concerned that T. H. was not meeting his developmental milestones. His diagnoses at that time included a gait abnormality, hemiplegic CP, and history of a choking episode.  In his history of present illness, Dr. Bolikal described T. H's. left hemiparetic distribution CP with an "etiology related to perinatal event," where his movement and tone abnormalities included spasticity.  The family's primary concern was expressive language, as T. H. had a vocabulary of only 5-7 words. Dr. Bolikal described issues of mobility and fine motor impairment, self-care impairment, and delayed communication skills. In addition to several referrals, including to physical, occupational and speech therapy, Dr. Bolikal recommended an MRI of the brain.

32.     On September 4, 2019, T. H.  had his first MRI of the brain without intravenous contrast.  The primary finding was an asymmetry in myelination with increased signal in the left periatrial and posterior periventricular white matter.  Beth Marie Kline-Fath, M.D., the interpreting radiologist, recommended repeat imaging in about six months.

33.     Repeat MRI of the brain was performed on June 15, 2020 on Dr. Bolikal's order. That study was interpreted as normal. The report states: "Specifically, the extent of myelination is appropriate for the stated age of 2 ½ years, and it is symmetric."

34. At a July 16, 2020 office visit with Dr. Bolikal, he recommended that T. H. continue with his current therapy, pursue preschool at age 3, and follow-up with the CP Team clinic in 6 months.

35. As the result of the medical treatment and care rendered by Cabell Huntington Hospital, the Marshall University Board of Governors, and their agents, servants and employees, Shelby and T. H., a minor, sustained serious and permanent injuries.

36. This medical professional liability action arises out of the medical care and treatment rendered to Shelby and T. H. a minor, by CHH, its agents, servants and employees; MUBOG, its agents, servants and employees; and John Does "1" through "5."

37. CHH employed executives, administrators, physicians, nurses, personnel, employees, and/or other health care professionals and agents, and held them out and warranted them to the public to be competent, careful and experienced in the care and treatment of patients and in the oversight of staff of said hospital.

38. MUBOG employed executives, administrators, physicians, nurses, personnel, employees, and/or other health care professionals and agents, and held them out and warranted them to the public to be competent, careful and experienced in the care and treatment of patients and in the oversight of staff of said hospital.

39. Plaintiffs fully complied with the pre-suit notification requirements found at W.Va.Code § 55-7B-6 and the Defendants did not elect mediation. A copy of the screening certificate of merit will/can be filed by Plaintiffs if required or requested by Defendant(s).

40. Certain claims asserted by the Plaintiffs may fall within the Medical Professional Liability Act's cap on non-economic damages and Plaintiffs reserve the right to challenge the constitutionality of the same.

## COUNT I

41. Plaintiffs reassert paragraphs numbered 1-40 of this Complaint as if fully stated verbatim herein.

42. At all times relevant to this civil action, Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," had duties:

    (a)    to use reasonable care in providing medical care to their patients;

    (b)    to select and retain only competent agents and employees;

    (c)    to oversee all persons who provide medical care within the walls of their facility as to patient care;

    (d)    to formulate, adopt and enforce adequate rules, policies and procedures to ensure quality care for their patients; and

    (e)    to provide a safe environment for patients.

43. Moreover, Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," breached their duties to Shelby and T. H., a minor, by failing to formulate, adopt, enforce and apply adequate rules, policies and procedures to ensure Shelby and T. H's. safety and care during the course of her treatment and care.

44. As a proximate result of the negligence and deviation of the standard of care of Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," Shelby, individually and as the Next Friend and Mother of T. H., a minor, has suffered and will suffer in the future mental and emotional distress; has lost will lose in the future the consortium of her son, T. H.; incurred and will incur in the future T. H's. medical expenses; incurred and will incur in the future the associated costs for an individual who has experienced

catastrophic injury and chronic health care needs; and was otherwise seriously and permanently injured.

45. As a proximate result of the negligence and deviation of the standard of care of Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," T. H., a minor, has suffered and will suffer in the future permanent disabilities and injuries; has suffered and will suffer in the future pain of body and mind; incurred and will incur in the future hospital and medical bills and expenses; will incur in the future lost wages; incurred and will incur in the future an impaired capacity to earn an income; incurred and will incur in the future needs with associated costs for individuals who have experienced catastrophic injury or have chronic health care needs; suffered and will suffer in the future the loss of the ability to enjoy life; and was otherwise seriously and permanently injured.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount that will reasonably compensate the Plaintiffs for their injuries, damages, expenses, attorney fees, court costs, plus prejudgment interest and interest on any verdict rendered herein.

A trial by jury is demanded.

## COUNT II

46. Plaintiffs reassert paragraphs numbered 1-45 of this Complaint as if fully stated verbatim herein.

47. This medical professional liability action arises out of the medical care and treatment Shelby Hanshaw and T. H., a minor, received from, Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," on and about September 17, 2017.

48. Plaintiffs fully complied with pre-suit notification requirements found at W.Va. Code §55-7B-6.

49. At all times relevant to this civil action, Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," were negligent in the care and treatment of Shelby and T. H., a minor.

50. Defendants, CHH and MUBOG acting by and through their agents, servants or employees and John Does "1" through "5," deviated from the standard of care by failing to exercise that degree of care, skill and learning required or expected of reasonable, prudent health care providers in the profession or class to which the health care provider belongs acting in the same or similar circumstances during the care and treatment of Shelby and T. H., a minor.

51. Defendants, CHH and MUBOG, their agents, servants and employees, and John Does "1" through "5," negligently rendered health care services to Shelby and T. H, a minor.

52. Such negligence was a breach of the standard of care and was a contributing proximate cause of Shelby and T. H., a minor's, injuries and damages.

53. As a proximate result of the negligence and deviation of the standard of care of Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," Shelby, individually and as the Next Friend and Mother of T. H., a minor, has suffered and will suffer in the future mental and emotional distress; has lost will lose in the future the consortium of her son, T. H.; incurred and will incur in the future T. H's. medical expenses; incurred and will incur in the future the associated costs for an individual who has experienced catastrophic injury and chronic health care needs; and was otherwise seriously and permanently injured.

54. As a proximate result of the negligence and deviation of the standard of care of Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," T. H., a minor, has suffered and will suffer in the future permanent disabilities and injuries; has suffered and will suffer in the future pain of body and mind; incurred and will incur in the future hospital and medical bills and expenses; will incur in the future lost wages; incurred and will incur in the future an impaired capacity to earn an income; incurred and will incur in the future needs with associated costs for individuals who have experienced catastrophic injury or have chronic health care needs; suffered and will suffer in the future the loss of the ability to enjoy life; and was otherwise seriously and permanently injured.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount that will reasonably compensate the Plaintiffs for their injuries, damages, expenses, attorney fees, court costs, plus prejudgment interest and interest on any verdict rendered herein.

A trial by jury is demanded.

## COUNT III

55. Plaintiffs reassert paragraphs numbered 1-54 of this Complaint as if fully stated verbatim herein.

56. At all times relevant to the Complaint, Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," acted maliciously, wantonly, mischievously or with criminal indifference to civil obligations, providing medical treatment or care to Shelby and T. H., a minor, resulting in serious and permanent injuries and damages.

57. As a direct and proximate result of the Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," acting maliciously, wantonly, mischievously or with criminal indifference to civil obligations, T. H., a minor, has suffered

and will suffer in the future permanent disabilities and injuries; has suffered and will suffer in the future pain of body and mind; incurred and will incur in the future hospital and medical bills and expenses; will incur in the future lost wages; incurred and will incur in the future an impaired capacity to earn an income; incurred and will incur in the future needs with associated costs for individuals who have experienced catastrophic injury or have chronic health care needs; suffered and will suffer in the future the loss of the ability to enjoy life; and was otherwise seriously and permanently injured.

58. As a direct and proximate result of the Defendants, CHH, MUBOG, their agents, servants and employees, and John Does "1" through "5," acting maliciously, wantonly, mischievously or with criminal indifference to civil obligations, Shelby has suffered and will suffer mental and emotional distress; has lost will lose in the future the consortium of her son, T. H.; incurred and will incur in the future T. H, a minor's, medical expenses; incurred and will incur in the future the associated costs for an individual who has experienced catastrophic injury and chronic health care needs; and was otherwise seriously and permanently injured.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount that will reasonably compensate the Plaintiffs for their injuries, damages, punitive damages, expenses, attorney fees, court costs, plus prejudgment interest and interest on any verdict rendered herein.

A trial by jury is demanded.

<u>/s/  Bert Ketchum</u>
Bert Ketchum (WVSB #6618)
Larry A. Bailey (WVSB #211)
GREENE, KETCHUM, BAILEY & TWEEL LLP
P.O. Box 2389
Huntington, WV 25724-2389
(304) 525-9115